**Eddie Mitchell TASBY, et al., Plaintiffs,**

**v.**

**Dr. Linus WRIGHT, General Superintendent, Dallas Independent School District, et al., Defendants.**

**Civ. A. No. 3–4211–H.**

United States District Court,
N.D. Texas,
Dallas Division.

April 30, 1984.

See also D.C., 542 F.Supp. 134.

Edward B. Cloutman, III, Mullinax, Wells, Baab, Cloutman & Chapman, Dallas, Tex., for plaintiffs.

E. Brice Cunningham, Dallas, Tex., for intervenor Black Coalition to Maximize Educ.

Robert H. Thomas, Strasburger & Price, Dallas, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

SANDERS, District Judge.

Before the Court is a Motion to Establish South Dallas Educational Centers ("the Motion"), filed April 20, 1984, by Defendant Dallas Independent School District ("DISD" or "the district"), as an alternative to its Motion to Revise Feeder Patterns, filed January 30, 1984; the February 22, 1984, Responses of Plaintiffs and the Black Coalition to Maximize Education to the January 30, 1984, DISD Motion; Plaintiffs' April 26 Response to the April 20 Motion; Defendants' April 30 Reply to Plaintiffs' April 20 Response; and two supplementing Motions filed April 30 by DISD (combine Austin/Crockett attendance zones and Ray/Fannin reassignments).

Plaintiffs oppose the January 30 Motion to Revise, but support the district's April 20 Motion subject to several qualifications and comments.[1] Intervenor Black Coalition opposes the January 30 Motion; the Coalition has not filed a response to the April 20 Motion, but its counsel has advised the Court that the Coalition opposes the Motion.[2]

The Court has determined that there is no necessity for a hearing; it appears from conferences with counsel that the material figures and facts set forth in the Motion are not in dispute.

■ In deciding this Motion the Court is bound to observe established principles of

---

1. Plaintiffs' position is significant. Since instituting this suit in 1970, Plaintiffs have been represented by the same able counsel, and have consistently fought for the constitutional principle of maximum feasible desegregation.

2. The establishment of the three South Dallas Educational Centers is consistent with the reme-

dies advocated by Intervenor Black Coalition when it intervened in this case in 1981. *Tasby v. Wright*, 520 F.Supp. 683, 690, 733. The Court does not know whether the Coalition now has the same member organizations that it had in 1981.

school desegregation law. First, of course, is the continuing affirmative duty of every previously segregated school system to bring about "the maximum desegregation practically achievable."[3] No school desegregation plan should be amended in a manner inconsistent with this fundamental principle.

■ Second, the Court must view the school district as a whole and not school-by-school; the goal is "to cure the continuing effects of the dual school system".[4] That is to say, it is the purpose of school desegregation to make whole the victims of past unlawful discriminatory practices.[5]

■ It is also basic that in school desegregation the district court has broad powers to establish equitable remedies.[6] Such remedies should accommodate the interest of school officials in administering school affairs consistent with the Constitution. *Milliken II*, 433 U.S. at 281, 97 S.Ct. at 2757; *Rapides II*, 702 F.2d at 1226. School desegregation remedies should be designed in the light of the particular circumstances, the options available and the practicalities of the situation.[7]

■ The district court should make use of its insight into local conditions and use "creativity in the fashioning and implementation of a desegregation plan". *Davis v. East Baton Rouge Parish School Board*,

721 F.2d 1425, 1437 (5th Cir.1983); *see Rapides II*, 702 F.2d at 1226. The inclusion of remedial education programs as part of a desegregation plan has been approved by the Supreme Court, the Fifth Circuit, and this Court. *Milliken II*, 433 U.S. at 283–287, 97 S.Ct. at 2758–2760 (and numerous cases cited therein); *United States v. Jefferson County Board of Education*, 380 F.2d 385, 394 (5th Cir.), *cert. denied*, 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed.2d 104 (1967); *Tasby*, 520 F.Supp. at 741.

Considered in the light of these principles, the January 30, 1984, Motion to Revise Feeder Patters would adversely affect desegregation and is unacceptable. The April 20 Motion is quite another matter, however. The centerpiece of the Motion is the establishment of three Educational Centers in South Dallas. Effective with the 1984–1985 school year approximately 2300 minority students from nine South Dallas K–3 attendance zones will attend these three Centers. These students are now being transported for desegregation purposes to schools outside of South Dallas in accordance with this Court's (Taylor, J.) 1976 decree. *Tasby v. Estes*, 412 F.Supp. 1192.

■ The current achievement levels for these students are appalling, far below

3. *Swann v. Charlotte Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Green v. New Kent County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *Davis v. Board of School Commissioners of Mobile County*, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971); *United States v. Seminole County School District*, 553 F.2d 992, 995 (5th Cir.1977); *Valley v. Rapides Parish School Board*, 646 F.2d 925 (5th Cir.1981) ("*Rapides I*").

4. *U.S. v. Valdosta Board of Education*, 576 F.2d 37, 39 (5th Cir.), *cert. denied*, 439 U.S. 1007, 99 S.Ct. 622, 58 L.Ed.2d 684 (1978); *Lee v. Tuscaloosa Schools*, 576 F.2d 39, 41 (5th Cir.1978); *Carr v. Montgomery County Board*, 377 F.Supp. 1123 (M.D.Ala.1974), *aff'd* 511 F.2d 1374 (5th Cir.), *cert. denied*, 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975); *Rapides I, supra.*

5. *Milliken v. Bradley*, 433 U.S. 267, 280, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977) ("*Milliken II*"); *Tasby v. Wright*, 520 F.Supp. 683, 705

(N.D.Tex.1981), *aff'd in part, rev'd in part*, 713 F.2d 90 (5th Cir.1983). *See also U.S. v. Columbus (Miss.) School District*, 558 F.2d 228, 231 n. 11 (5th Cir.1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 728, 54 L.Ed.2d 757 (1978).

6. *Swann*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554; *United States v. Crucial*, 722 F.2d 1182, 1188 (5th Cir.1983); *Valley v. Rapides Parish School Board*, 702 F.2d 1221, 1225 (5th Cir.), *rehearing denied*, 705 F.2d 112, *cert. denied*, —— U.S. ——, 104 S.Ct. 276, 78 L.Ed.2d 256 (1983) ("*Rapides II*").

7. *Green*, 391 U.S. at 439, 88 S.Ct. at 1694; *Milliken II*, 433 U.S. at 287, 97 S.Ct. at 2760; *U.S. v. Crucial*, 722 F.2d at 1186–87; *Ross v. Houston I.S.D.*, 699 F.2d 218, 227 (5th Cir.1983); *Ross v. Eckels*, 434 F.2d 1140, 1147 (5th Cir.1970) (per curiam), *cert. denied*, 402 U.S. 953, 91 S.Ct. 1614, 29 L.Ed.2d 123 (1971).

norms for the district. More than four-fifths of these pupils are below the national norm; nearly three-fifths rank in the lowest 30th percent nationally. Motion, Appendix B, Figure 4.0. The district proposes to address this crisis by providing these students instruction more concentrated than is available at the 4–6 Centers which they currently attend. Motion, Appendix A. Put another way, the district proposes further desegregation for these minority students at the 4–6 level by remedial education measures rather than by transportation—a creative approach for a heavily minority system like DISD,[8] sanctioned by the Supreme Court in *Milliken II, supra,* and endorsed by black educators.[9] The Court finds that, taken in the context of other desegregation programs in the district, the South Dallas Centers will not adversely affect desegregation.[10] Desegregation transportation in grades 7–8 will not be reduced; 4–6 transportation in other areas will continue. April 20, 1984 Motion, Figure 1.0.

Although the focus of the April 20 Motion is on the three South Dallas Centers, it has other important aspects which must be considered. There are currently 27 4–6 Centers receiving students transported for desegregation purposes. January 30, 1984, Motion, Figure 1.0. The school district proposes to close two of these (Longfellow and Hotchkiss), to add two 4–6 Centers (Field and Hexter), and to exclude ten of the current Centers from the transportation program entirely. April 20, 1984, Motion, Figure 2.0. Seventeen 4–6 Centers will remain. *Id.,* Figure 1.0.

The Court finds that racial balance in these 17 remaining 4–6 Centers will likely be stabilized, and in some instances improved, by the proposed revision. *Compare* Figure 1.0, January 30 Motion *with* Figure 1.0, April 20 Motion.

■ With respect to the ten 4–6 Centers recommended for exclusion, the Court finds that only one (Reilly) will become predominantly anglo. The Court is familiar with time/distance patterns in the district and finds that Reilly, in the northeastern corner of the district, may be beyond the reach of feasible transportation for 4–6 students coming from a minority K–3 area. *See Tasby v. Wright,* 520 F.Supp. at 726, 735. Still, if the Motion is approved, a considerable number of 4–6 students will no longer be in a desegregated setting. In the Court's view, this negative aspect is outweighed by several positive factors: the improvement in racial balances at the 4–6 Centers remaining in the transportation program, the shortening of bus rides on several 4–6 routes, and the omission of naturally desegregated areas from 4–6 transportation. The Court has also weighed the size and changing demographics of the district, *see Tasby,* 520 F.Supp. at 692–700, the racial composition of the current student population[11] and the critical need for the educational remedies which will be established at the three South Dallas Centers. The Court is satisfied, and finds, that the proposed 1984–85 Desegregation Busing Plan for the 4–6 level (April 20 Motion, Figure 1.0) will not adversely affect desegregation in the DISD. The Court makes the same finding with respect to proposed 1984–85 desegregation assignments for 7–8 Centers (April 20 Motion, Figure 3.0), which are almost the same as current 7–8 assignments.

The Court further finds that relocation of the Montessori program, K–8, to Hotchkiss will not adversely affect desegrega-

---

**8.** The district has 127,324 students, of whom 50% are black and 23% are hispanic. Report to the Court of the Dallas Independent School District, April 16, 1984, Appendix A at 325.

**9.** Bell, *Time for the Teachers: Putting Educators Back into the Brown Remedy.* 52–3, Journal of Negro Education 290 (1983). *See, also, Tasby v. Wright,* 520 F.Supp. at 741–743.

**10.** The Court cautions, however, that remedial education can never be the complete solution to previous segregation. The *sine qua non* is the combination of remedial education and other desegregation measures, including feasible transportation, in the desegregation plan for the district as a whole.

**11.** See note 8, *supra.*

tion. Indeed, because Hotchkiss is slightly more centrally located, the Montessori program may attract more students of all races.

The Court finds that the closings and consolidations (Hotchkiss to Rogers, Longfellow to Williams) will not adversely affect —indeed, may benefit—the desegregation process.

The transfer of the Pearl C. Anderson Career Exploration Academy to Longfellow, standing alone, may not be beneficial to desegregation.[12] Longfellow is across town from Anderson Academy and it seems likely that many of the 322 students now attending the desegregated Academy (58% black, 30% anglo, 12% hispanic)[13] may not return when it is moved. Even so, the new location of the Academy is in a naturally desegregated area, reasonably accessible from all parts of the District. The Court believes that there is substantial prospect that the Academy may in a short time attract more students than it now has. The Court finds that this move will not adversely affect desegregation in the district.

Although the subject is not specifically addressed in the Motion, it should be understood, and the Court will require, that the majority-to-minority transfer provisions of the February 1, 1982, Judgment will be available to all students affected by this Opinion. *See Tasby v. Wright*, 542 F.Supp. 134, 142 (1981). It is also understood and required that the funds for the South Dallas Centers shall be in addition to the programmatic remedy funds provided and allocated by previous Court orders.

Plaintiffs urge, and the Court directs, that the physical facilities at the three South Dallas Education Centers must compare favorably with the facilities which the students are leaving. Any improvements necessary to meet this requirement must be accomplished before the Centers are opened. The External Auditor will monitor this requirement and report to the Court as directed.

The Court regards the Motion to establish South Dallas Educational Centers as a laudable commitment by the Dallas Independent School District to improve significantly the achievement levels of the students who will attend the Centers.[14] Motion, Appendices A & B. The purpose is clear and progress will be measurable. The External Auditor is directed to include in his Annual Report, beginning in 1985, a report on the success of the district in meeting the goals stated in the Motion. *Id.*, Appendix B at 22. In the event the achievement level objectives are not being met, the Court may, after hearing, require the district to provide such additional remedial education measures at the South Dallas Educational Centers as may appear to be necessary to enable the district to fulfill its commitment.

█ Plaintiffs urge that a readily identifiable person or office be designated as responsible for the success or failure of the programs at the three South Dallas Centers. Plaintiffs also urge that specific standards be established for teacher qualifications, salaries, and pay incentives at the Centers. Plaintiffs' suggestions have much merit. However, in view of the district's commitment, upon which the Court relies, to improve the achievement levels of those attending the Centers and the implementation provided in the Motion and in this Opinion, the Court believes it appropri-

---

**12.** One of the three South Dallas Centers will be at Anderson. The Academy must be relocated to provide space for 1360 4–6 students who will attend the Center. Motion, Exhibit A.

**13.** April 16, 1984, Report to the Court of the Dallas Independent School District, Appendix B at 20.

**14.** Teacher/pupil ratio will be 1:20; the district-wide ratio is 1:27. There will be special train-

ing and incentives for teachers, and educational programs not available at other 4–6 Centers. The goal is to reduce the percentage of students below the 30th and 50th percentiles in reading, national norms, by 10% per year. The goal will be maintained until students from the three Centers reach the district-wide goal for 4–6 achievement (currently 85% of the students to be at or above the 50th percentile on nationally normed tests).

ate to leave such specifics to the district at this time.

Plaintiffs are concerned that the achievement objectives for the three Centers do not include math. Plaintiffs' April 26 Response, § 10. The district replies that there will be substantial emphasis on math training. DISD's April 30 Reply, § X. The Court agrees with Plaintiffs' concern but, in view of the district's representations and the compelling need for immediate action to raise reading levels, the Court is of the opinion that setting similar objective achievement goals for math at the three Centers should be deferred. At the end of the 1984–85 school year, or at any time thereafter, on application of a party or *sua sponte*, the Court will consider setting the same type of measurable achievement goals for math at the three Centers as are now being established for reading.

Since the district's commitment for achievement for the Centers is tied to the current district-wide achievement goal for all 4–6 students, *see* Motion, Appendix B, at 22, the district-wide goal may not be changed without prior court approval.

Finally, the Court commends the school district for its initiative and creativity in this matter. The Court especially commends counsel for the parties (plaintiffs, the district and the Black Coalition) who have negotiated diligently and in good faith for many weeks.

Viewing the school district as a whole and not school-by-school, the Motion to Establish South Dallas Educational Centers does not contravene the principles of school desegregation law; it is consistent with the aims of school desegregation. The district's April 20 Motion, supplemented April 30, is therefore **APPROVED.**

SO ORDERED.